## JACK GORDON v. STATE.

No. A-7622. Opinion Filed Nov. 8, 1930.
(292 Pac. 1041.)

Jno. V. Roberts, for plaintiff in error.

J. Berry King, Atty. Gen., and Ed Crossland, Asst. Atty. Gen., for the State.

DAVENPORT, J. The plaintiff in error, hereinafter referred to as the defendant, was convicted of rape in the first degree, and sentenced to serve 15 years in the state penitentiary. Motion for new trial was filed, considered, overruled, and exceptions saved, and the defendant by

petition in error, with case-made attached, has appealed to this court.

An abstract of the testimony is as follows: That on Thursday night, May 2, 1929, the defendant attended a dance at the Yeoman Hall. The prosecuting witness, Jewell Spiker, was also attending the dance.

"The defendant was not acquainted with me, but asked me to dance with him and I accepted his invitation, and after the dance was over the defendant took me and my niece, Ruby Ables, to my home. When we reached my home my niece got out and the defendant took me for a ride and tried to kiss me, and I refused, and in a short while he took me home. The next afternoon about 5:30 he called up and said he wanted to see if I would go out for a drive. I talked with him, and he said he would have to work until 9 o'clock and I could meet him down town. I told him Ruby and I was coming to town window shopping, and we came down and stopped in front of Kliens, on the north side of the square. I am 27 years of age. The defendant told me he was a piano man, teaching piano for a conservatory from Dallas, Tex. Ruby and I met him the following evening about 9 o'clock and got in the car with him. We went west on the pavement about a mile, then turned south and east to the pavement and came back, and he took us to Corry's and got us a drink. We afterwards drove back to my mother's house and Ruby got out. The defendant asked me to take a ride with him, and I protested, saying it was too late. He started his car, and after driving about the city a short while drove three or four miles north of the city and turned off the road a short distance, then stopped his car and turned out the inside lights and took me in his arms and tried to kiss me. He put his tongue in my mouth and I bit it. He then turned out all the lights and tried to straddle me. He held my hands and got me down in the seat and took my bloomers off, and I slid from under him and said I was going back to town, and he made me get back in the car, and we drove another mile or two and he stopped

again, and we had another struggle. I got away from him and got out of the car, and he scuffled with me until I was exhausted and then succeeded in having sexual intercourse with me by force. All the time from the time he first stopped the car I was fighting, kicking, screaming, and crying, and begging him to take me home, and pleading with him to let me alone. After he had accomplished his purpose he drove me home and put me out. I at once told my mother what had occurred, and the next morning she called Dr. Henson to attend me. I was in bed three or four days, and later Dr. Mahoney was called."

Ella Spiker, the mother of the prosecuting witness, testified:

"That on the night of the alleged trouble Ruby Ables came in just after midnight and went upstairs to bed, and I supposed Jewell would be in soon and dropped off to sleep. After a while I woke up and went to see if Jewell had come in, and found that she had not, and I stayed awake until she come. When she did come home she told me Gordon had assaulted and ruined her. I said, 'For God's sake what is the matter?' and she said she was smarting and hurting until she could not stand it, and I told her I would get some warm water and bathe her; I found she was bruised on both legs and sides, and her neck; her limbs were black and blue. The next morning I called Dr. Henson. She remained in bed until the following Wednesday, about five days."

Dr. Mahoney also examined her at his office. Dr. Mahoney testified he was called to see the prosecuting witness four or five days after the alleged assault and found bruises on her body and legs. He could not tell definitely whether she had had intercourse. "I could not state positively as to the indication as to whether the hymen had been recently ruptured."

Dr. Henson also testified to bruises and scratches on the body and legs of the prosecutrix. He could not defi-

nitely tell whether the prosecutrix had had intercourse. The testimony of the prosecutrix is positive that the defendant did have intercourse with her and penetrated her body.

There is considerable testimony in the record as to the nervous condition of the prosecutrix. The defendant in his testimony states: He met the prosecutrix at a dance and took her and her niece Ruby for a ride, and that Ruby stopped at Jewell's home, then he and Jewell went for a drive, and while on the ride the defendant claims the prosecutrix kissed him; that Friday afternoon he called the prosecutrix and asked her to meet him down town, and she agreed to do so; that she and her niece came to town about 9 o'clock in the evening and they got in the car and drove for a while, and then drove to the home of the prosecutrix and her niece got out.

"I then asked the prosecutrix to take a ride, and she objected, saying it was too late. I told her I would bring her back by 12 o'clock and started my car. We drove around the city for a while and then north about three or four miles, where I left the pavement and stopped my car about 25 feet from the highway. I turned out the inside lights and asked her to kiss me. She at first refused, but then kissed me. We had a scuffle, and Jewell got out of the car and said she was going to walk back to town. I got out and told her to get back in the car and I would take her home. I then asked her to kiss me, and she gave me a French kiss before getting back in the car. The defendant explained a French kiss was performed by putting their tongues in each other's mouth. The prosecutrix then got back in the car, and I did not say anything to her. Instead of driving straight back to town, I drove east a mile or two and stopped my car and asked her if she did not like me well enough to have pleasure with me. She got out of the car in the same manner as she had done before. I got out and she gave me three French kisses and during the kissing she fell down an embank-

ment and bruised herself. She started to walk back to town, and I put her in the car and brought her home. She was grouchy, but promised to meet me on the morrow. I told her I would get groceries for her mother. I left town and went to Guthrie, where I was arrested on Tuesday."

Several witnesses were called by the defendant who testified as to his previous good character.

The defendant has assigned four errors alleged to have been committed by the court in the trial of his case. A careful examination of the errors assigned by the defendant shows that they are all embraced in the first assignment, which is that the court erred in overruling the plaintiff in error's motion for a new trial.

The defendant argues that the testimony in this case is insufficient to sustain the judgment. The testimony in this case conclusively shows that the defendant first met the prosecuting witness at the dance and asked permission to take her home. There is no conflict in the evidence as to what took place from the time defendant met the prosecutrix at the dance until the niece, Ruby Ables, left the parties at the home of the prosecutrix the night of the alleged offense. From the time the niece left the car there is a sharp conflict in the evidence as to what took place. The defendant stated he kissed the prosecuting witness and she got out of the car and started to walk home; he persuaded her to get back in the car and they drove a short distance and stopped, where he insists that the prosecuting witness gave him some French kisses, and fell down an embankment and bruised herself. The prosecutrix denies she voluntarily kissed the defendant, and states that the defendant by force, she screaming, fighting, and complaining all the time, had intercourse with her, against her will. This is the only conflict in the tes-

timony. The prosecutrix tells a straightforward story, and is not contradicted in any particular by the defendant, or any other witness, except as to the act of cohabitation. On this point the jury seems to have believed the evidence of the prosecutrix as taken in connection with other testimony, and by its verdict found that the testimony was sufficient beyond a reasonable doubt to convict the defendant.

After a careful reading of the evidence in this case, we hold that the testimony is sufficient to warrant the jury in finding a verdict of guilty, and this court will not disturb that verdict. The defendant was accorded a fair and impartial trial; the court correctly advised the jury as to the law applicable to the facts in the case.

Finding no errors in the record, the judgment is affirmed.

EDWARDS, P. J., and CHAPPELL, J., concur.